## SEMINOLE ROCK & SAND CO. v. FLEMING.

### No. 402.

United States Emergency Court of Appeals.

Heard at Washington, D. C., Feb. 15, 1947.
Decided March 12, 1947.

Aaron L. Ford, of Washington, D. C., for complainant.

Josephine H. Klein, Sp. Asst. to Associate Gen. Counsel, of Washington, D. C. (Carl A. Auerbach, Gen. Counsel, William R. Ming, Jr., Associate Gen. Counsel, and Rosanna A. Blake, all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

McALLISTER, Judge.

On January 6, 1947, the Seminole Rock and Sand Company, under leave of the District Court for the Southern District of Florida, and pursuant to Section 204(e) of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A.Appendix, § 924(e), filed complaint against the Price Administrator, seeking a judgment setting aside Maximum Price Regulation No. 188 [1] on the ground of invalidity. The Temporary Controls Administrator (successor to the Price Administrator) moved to dismiss the complaint for failure to allege facts sufficient to demonstrate the invalidity of the regulation, and this motion is now before us for disposition.

For a proper understanding of the issue, a brief survey of the circumstances leading up to the present controversy will be helpful. From the findings of the district court in certain injunction proceedings previously brought by the Price Administrator against complainant herein, in Bowles v. Seminole Rock & Sand Co., D. C., 59 F.Supp. 751, it appears that in March, 1942, complainant was engaged in filling orders for crushed stone ballast for a railroad company, under a contract previously entered into, which provided for a price of 60 cents a ton, and that, during that month, it had made shipments pursuant to the contract; that in January,. 1942, complainant had accepted orders for crushed stone from a government contractor to be delivered as called for at $1.-50 a ton, but that inasmuch as the contractor was not ready for deliveries in March, 1942, they were not made until later in August; that complainant, in March, 1942, made a new contract with Seaboard for crushed stone ballast at 85 cents a ton, and made deliveries thereunder subsequent to March; and it further appeared that the crushed stone contracted to be sold to the government contractor and that sold to the Seaboard as ballast were substantially the same commodity.

The Price Administrator had sought to enjoin the company from selling at a price in excess of 60 cents a ton on the ground that this was the only price at which it had delivered such commodity in March, 1942—the base period—and that, according to the regulation, the price of 60 cents a ton was its maximum price. The Administrator based his contention on the language of the regulation [2] which provided that "the maximum price for any article which was delivered or offered for delivery in March 1942 by the manufacturer shall be the highest price charged by the manufacturer during March 1942 (as defined in Section 1499.163) for the article." Section 1499.163 (a) (2) provided that for the purposes of

[1] 7 F.R. 5872.

[2] Sections 1499.153(a) and 1499.163(a) (2) of Maximum Price Regulation No. 188. 7 Fed.Reg. 7968–7969.

the regulation, the term, "highest price 'charged during March, 1942' means (i) The highest price which the seller charged to a purchaser of the same class for delivery of the article or material during March, 1942;". In answer to the Administrator's application for an injunction, the company contended that the highest price charged for delivery should be construed to mean the highest price charged under pre-existing contracts for commodities that were subject to demand for delivery during the month of March 1942.

In its determination of the case, the district court held that the January 1942 contract to sell stone at $1.50 a ton to a government contractor, which contemplated deliveries in March 1942, established a maximum price for such stone under the Price Control Act, in spite of the fact that deliveries of such stone were not actually made until after March, 1942. On appeal to the Circuit Court of Appeals for the Fifth Circuit, the district court was affirmed in an opinion in which it was said that the maximum price regulation provided that the highest price charged during March, 1942, the base period for ceiling prices, meant the "highest price charged * * * for delivery" of the given commodity during March, 1942; and that such provision also embraced "not only charges for deliveries actually made during that month, but also charges for delivery offered under the settled terms of pre-existing contracts." Bowles v. Seminole Rock & Sand Co., 145 F.2d 482, 485. On certiorari to the Supreme Court, the judgment of the circuit court of appeals was reversed, in an opinion holding that, under the terms of the regulation, the prices charged in sales where delivery was actually made in March, 1942, were controlling over prices embodied in pre-existing contracts or offering prices during that period, and that, accordingly, complainant's maximum price for the crushed stone which it had sold to Seaboard was 60 cents a ton. In this, it sustained the Administrator in his contention that the regulation provided that the price "charged for delivery" in the base period, was the base period price. The Supreme Court did not reach any question as to the constitu-

tionality or statutory validity of the regulation as construed, remarking that such questions must, in the first instance, be presented to the Emergency Court of Appeals. Bowles v. Seminole Rock Co., 325 U.S. 410, 418, 65 S.Ct. 1215, 89 L.Ed. 1700. Accordingly, under the complaint filed herein, the validity of the regulation is here before us for determination.

It is contended by complainant that the requirement by the Administrator as set forth in the regulation of "actual delivery" of the commodities sold in order to establish prices during the base period, which are to be taken as those fixing maximum prices, was arbitrary and capricious and amounted to a substitution of his definition of the term "sale," in place of the definition provided in the Act by Congress. It would, however, be inexact to say that the Administrator had defined "sale," for actually, he did not. Yet what complainant says is that, in effect, he did so.

Section 302(a) of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A.Appendix, § 942(a), provides:

"As used in this Act—

"(a) The term 'sale' includes sales, dispositions, exchanges, leases, and other transfers, and contracts and offers to do any of the foregoing. * * *"

Under Section 2(a) of the Act, 50 U.S.C.A.Appendix, § 902(a), the Price Administrator is directed, in establishing maximum prices for a commodity, to ascertain and give due consideration to the prices prevailing for such commodity during a base period in which, in his judgment, the prices for such a commodity are generally representative. What the Administrator did, therefore, in this case, was to select a period which he considered generally representative of the prices charged for the commodity in question, and then proceeded to ascertain complainant's price during that period. The basic and primary purpose of the Administrator was to stabilize prices at the actual market level in March, 1942. What did he select, then, as a seller's price during that period? There were open to him a variety of prices for this purpose—those embodied in pre-existing contracts of sale; prices set forth

in contracts of sale entered into during the base period; and prices at which commodities were actually delivered during that month. He could, it seems to us, reasonably conclude that contracts which were entered into before the base period, which he selected, might have been executed with a view to a speculative price rise. The country was in a crucial situation and sellers could well take advantage of the possibility of future contingencies to reap large profits in a scarcity market. Contracts with such an end in view could conceivably be later abandoned if the market did not support increases of this nature. The Administrator was not obliged to consider whether contracts of sale for future delivery were speculative or to determine whether contracts of this nature were conceived as gambling ventures, profit gouges, or as merely embodying the prices then generally prevailing for the commodities in question. In arriving at his determination, he could reasonably conclude that actual deliveries during a particular period would probably most accurately reflect prevailing market conditions and prices at that time. Moreover, such a test would have the merit of ascertaining more definitely and easily the prices at which such goods were sold, by referring to deliveries during that period, than to ascertain such prices from offers to sell or from prices contained in pre-existing contracts where deliveries were not made during the base period. The fact that the method adopted by the Administrator in establishing maximum prices might cut across pre-existing contracts would not render the regulation invalid. Philadelphia Coke Company et al. v. Bowles, Em.App.1943, 139 F.2d 349. He, therefore, provided in the regulation that the maximum price was the highest price charged for a commodity which was delivered in March, 1942, regardless of when the sale was consummated. But there were other eventualities also to be provided for. In cases where there were no actual deliveries in March, 1942, the basic test was to be departed from, and the maximum price was then based upon the "highest offering prices" to various purchasers.[3] Finally, the Administrator took into consideration the remaining situations—where the maximum price established by the foregoing provisions of the regulation caused a seller substantial hardship, and was abnormally low in relation to the maximum prices established for competitive sellers of the same or similar commodities. In such a case, the Administrator made provision in the regulation for adjustment of such prices by establishing for a seller in this predicament maximum prices bearing a normal relation to the maximum prices established for competing sellers of the same or similar commodities—provided that such an adjustment would not cause or threaten to cause an increase in the level of retail prices.[4]

In contending that its maximum price should be $1.50 a ton for crushed stone instead of 60 cents a ton, the delivered price to Seaboard in March, 1942, complainant submits that it cannot be 'argued by the Administrator that the contract with the government contractor for sales at $1.50 a ton, executed in January, 1942, was an artificial device for evasion of price control. This claim may be conceded. But that does not result in the regulation's being arbitrary. Nor is the case of Montgomery Ward & Co. v. Bowles, Em.App.1945, 147 F.2d 858 here applicable to sustain complainant's claim of unfairness, discrimination, and inequitable treatment.

In the Montgomery Ward case, the regulation provided that if a delivery were not made in March, 1942, of a garment of any particular category within the "highest price line" handled (or offered for sale) by a merchant, that merchant *would be forced to discontinue future sales* of that grade merchandise in that category, if during the base period he happened to have made a delivery within a lower price line in the same category. The result of the regulation was that a competitor of such a merchant who had made a delivery during March, 1942, in the highest price line which it handled, would suffer no such result. This court held that merchants in the same situation, under the form of regula-

---

[3] Sections 1499.163(a) (2) (i) and (ii), 7 F.R. 7968, 7969.
[4] 1499.161(a) (1).

tion there in effect, were thereby subjected to different price controls, because one who made a sale during the base period could continue selling his garments, while one who had not made such a sale, was required to eliminate and abandon the sale of all such garments; and the regulation was, accordingly, held invalid for unlawful discrimination. The nature of the discrimination that resulted in the forced exclusion of a merchant from the sale of goods, is not present in the instant case.

Complainant, in seeking to bring this controversy within the rule of the Montgomery Ward case, refers to the opinion of the Circuit Court of Appeals for the Fifth Circuit in the injunction proceedings, heretofore mentioned, in which it was said, in reference to complainant's contracts for the sale of crushed stone to Seaboard and the government contractor: "* * * Here the seller had two enforceable contracts, made at arms-length in the due course of business prior to March, 1942, under which it was required to deliver its product at the demand of the purchasers. The agreed selling price under the one was as much a 'prevailing price' during the base period as was the selling price of the other. Each purchaser had an equal right to demand, or not to demand, delivery under his contract during the month of March. In these circumstances, does 'fairness and equity' in determining the highest price charged require that the highest of these contract prices should control, or should the maximum price chargeable for future business be fixed at the smaller price on the superficial basis that one purchaser chanced to require a delivery in March and the other did not? We do not think the cited regulations compel a result so unreasonable and so antagonistic to the letter and spirit of the Act as that contended for by the Administrator. * * *"

■ Complainant's case could not be more persuasively stated. It is to be noted, however, that in reversing the circuit court of appeals upon the very point in issue, the Supreme Court held that there existed no doubt that the cited regulations were to be construed as contended for by the Administrator. If we were empowered to determine this controversy by the exercise of

broad general powers of equity jurisdiction, we would be called upon to resolve issues different than those before us. The jurisdiction of this court is, however, strictly limited by statute, and we are here confined to a determination whether complainant has sustained the burden of proving that the regulation in question is arbitrary, capricious, and contrary to law.

■ Considering the problems with which the Administrator was faced, his primary purpose of stabilizing prices at the actual market level of March, 1942; the provisions made to alleviate hardship in individual cases where sellers were subjected, because of the general terms of the regulation, to abnormally low prices; and the fact that the regulation was fair on its face: it is our conclusion that the adoption of the actual delivery test to determine the prices of base period sales, upon which maximum prices were established, was reasonable and in conformity with the standards and objectives of the Act.

Complainant refers to the fact that the district court found that the crushed stone sold to Seaboard was an absolute necessity for carrying on its business as a railroad; that complainant's quarry was practically the only place from which certain parts of the railroad could secure such ballast rock; that it was in the public interest that such shipment of rock to the railroad be continued; and that complainant "cannot sell ballast rock to the railroad at 60 cents a ton under present prices without resulting in an absolute loss and it could not go on with deliveries of ballast rock at this price." All of these circumstances bear upon the individual hardship suffered by complainant, but no application for adjustment to alleviate such hardship was ever filed by it. However, complainant points out, in this connection, that both a district court and a circuit court of appeals subsequently sustained complainant in its view that the proper interpretation of the regulation was that complainant's maximum price was the price embodied in the pre-existing contract of sale to Seaboard. It is submitted that where two federal courts have decided that complainant properly interpreted the regulation, it is demanding too much on the part of a citizen to require him, under

such circumstances, to foresee that the Administrator would construe the regulation otherwise, and that the Supreme Court would sustain him therein—at the risk to complainant of liability for treble damages, for not having, forthwith, before such sales, made application for adjustment to alleviate the individual hardship to which it was subjected—by a regulation that it reasonably considered inflicted no such hardship. It is, however, beyond the jurisdiction of this court to remedy such a plight. The Supreme Court, as has been said, decided that the construction given to the regulation by complainant and by the other federal courts was erroneous and that of the Administrator, correct.

Complainant further contends that Maximum Price Regulation No. 188 made no proper provision under which complainant could secure an adjustment to alleviate the hardship imposed by its provisions. From what has been submitted to us in the briefs of counsel, it appears that application for adjustment to alleviate individual cases of hardship suffered from the general terms of the regulation could have been filed under the section already mentioned [5] up to and including November 15, 1942. Since that time, a multitude of amendments to that section has been issued. We are not advised whether complainant could at the present time file an application for individual relief similar to that which was provided for up to November, 1942. The implication in the arguments addressed to us is that this is not now possible; for complainant emphasizes that it first received notice that the Administrator was contending that its maximum price for crushed stone was 60 cents a ton, on October 21, 1943, when he filed his suit against it in the district court in Florida, and that complainant had honestly believed before that time that the construction placed upon the regulation was reasonable and valid. In this connection, complainant again emphasizes that its belief was sustained as correct by two federal courts.

█ If complainant has, since the sales in question, been deprived of the right it then had of filing application for adjust-

ment because of amendments of the regulation, it would not thereby result that the regulation was invalid. There was, in the first instance, a right provided for adjustment of prices even though it was available only for a limited time. Under the rule in Yakus v. United States, 321 U. S. 414, 64 S.Ct. 660, 88 L.Ed. 834, this was sufficient to sustain the validity of the regulation. In any event, it is questionable whether complainant would have been entitled to retroactive relief for sales made, on the ground that it justifiably believed that its maximum price under the regulation was the price provided for in its pre-existing contract under which deliveries could have been required in the base period and under which it was intended to make such deliveries at that time.

From everything that appears, complainant exercised the utmost good faith in the transactions in question, and application of the "actual delivery" provisions of the regulation results in extreme hardship. But the limited jurisdiction of this court affords no remedy to complainant. The only issue before us is whether complainant has established that the regulation was arbitrary, capricious, and contrary to law. From what has been said, we are of the opinion that it has not been able to sustain that burden.

█ Complainant further strenuously urges, in effect, that the regulation is invalid because complainant's delivery of crushed stone in March, 1942, upon which its maximum prices were based, was, as found by the district court, at a price below its cost. The validity of a regulation, however, depends not upon its effect on a particular seller, but on the industry as a whole. Van Der Loo v. Porter, Em.App. 160 F.2d 110; Ben H. Rosenthal & Co. v. Porter, Em.App.1946, 158 F.2d 171. With respect to complainant's claim that it was unfairly discriminated against and that other sellers were afforded higher prices by reason of having made deliveries at higher prices during the base period, "It is well settled that a regulation may be valid though it subjects an individual to hardship or has one effect on one individual

---

[5] Section 1499.161(a) (1).

and a different effect on another. \* \* \* If the regulation on its face appears fair, it is not to be held invalid simply because it eventuates, upon further consideration, that some in an industry were found to have suffered hardships." Van Der Loo v. Porter, supra. There was no discrimination against complainant resulting from the application of different techniques or standards to different sellers similarly situated. Here, again, it should be emphasized that the Administrator made provision to alleviate hardships in individual cases where it could be done without undermining the purpose of the Act. In the absence of such an application and a hearing on complainant's claims in regard thereto, it cannot be held that the regulation as applied was unreasonable. See Vitamins, Inc. v. Bowles, Em.App.1945, 149 F.2d 497, 499.

The final point for consideration is the claim that the regulation was invalid because the Administrator did not consult and advise with representative members of the industry engaged in the manufacture of crushed stone before issuing Maximum Price Regulation No. 188, although, it is alleged, it was practicable for him to have done so. See Section 2(a) of the Emergency Price Control Act of 1942, as amended. On August 1, 1942, the General Maximum Price Regulation was superseded by Maximum Price Regulation No. 188—Manufacturers' Maximum Prices For Specified Building Materials And Consumers' Goods Other Than Apparel. This was similar to the General Maximum Price Regulation. It did not relate to any specified industry and was general in all of its provisions. In effect, it was an extension of the General Maximum Price Regulation, designed, as counsel for the Administrator will observe, "to facilitate the pricing of new items in those fields in which war-born material shortages most widely necessitated the introduction of new commodities or new models of old items;" and it extended the former regulation "with refinements of the pricing techniques for new commodities." This is borne out by the statement of considerations accompanying its issuance.

In Interwoven Stocking Company v. Bowles, Em.App.1944, 141 F.2d 696, where a complainant contended that the General Maximum Price Regulation was invalid because the Administrator did not consult with representatives of the men's hosiery industry before issuing the regulation, the court observed that while Section 2(a) of the Act provided that the Administrator should, as far as practicable, advise and consult with members of the industry which would be affected by the regulation or order, before issuing any such regulation, nevertheless, the all-inclusive scope of the regulation and the urgent necessity for its prompt issuance made it impracticable to consult with each industry to be affected, and that such consultation was, therefore, not required by the Act. In view of the variety of the commodities covered by Maximum Price Regulation No. 188—"the all inclusive scope" thereof—and because it is essentially only an extension of the General Maximum Price Regulation, we are of the opinion that the rule underlying the decision in the Interwoven Stocking Company case should here control, and that it was impracticable and unnecessary, under the above mentioned circumstances, for the Administrator to consult with each industry that might be thereby affected.

In accordance with the foregoing, a judgment will be entered granting respondent's motion and dismissing the complaint.